# In the United States Court of Federal Claims

No. 16-376C
(Filed under seal May 31, 2017)
(Reissued July 5, 2017)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **BOARD OF REGENTS OF THE NEVADA SYSTEM OF HIGHER EDUCATION, on behalf of THE DESERT RESEARCH INSTITUTE,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant,<br>and,<br><br>**OAK RIDGE ASSOCIATED UNIVERSITIES,**<br><br>Defendant-Intervenor. | Post-award bid protest; U.S. Dept. of Energy; omissions of required information from proposals; alleged clerical error; failure to request clarification; unstated evaluation method; non-disclosure of incumbent contract staffing information; alleged disparate treatment due to incumbent facilities; *Blue & Gold Fleet* waiver. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*J. Hatcher Graham*, Warner Robins, Ga., for plaintiff.

*Joseph E. Ashman*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director, all of Washington, D.C., for defendant. *Monekia Franklin*, Office of General Counsel, and *Kristopher D. Muse*, Office of Chief Counsel, U.S. Department of Energy, Washington, D.C., of counsel.

*Jessica C. Abrahams*, Dentons US LLP, with whom was *Erin B. Sheppard*, both of Washington, D.C., for defendant-intervenor. *Katherine L. Veeder* and *Deborah N. Rodin*, Dentons US LLP, Washington, D.C, of counsel.

## OPINION AND ORDER†

WOLSKI, Judge.

This bid protest challenges the award of a contract by the United States Department of Energy (DOE or the Agency) to defendant-intervenor Oak Ridge Associated Universities (ORAU or intervenor).  Plaintiff, the Board of Regents of the Nevada System of Higher Education, filed this post-award protest on behalf of the Desert Research Institute (DRI), which was an unsuccessful offeror for the award.  Plaintiff asserts that the Agency made various errors in the evaluation of its proposal and that of its competitor; failed to disclose certain information concerning the predecessor contract and the manner in which proposals would be evaluated; and failed to request clarification regarding an omission from its proposal.  The Court has determined that the Agency's decision to award the contract to ORAU was in accordance with law, and was neither arbitrary nor capricious.  For the reasons explained below, defendant's and intervenor's cross-motions for judgment on the administrative record are **GRANTED** and plaintiff's motion for judgment on the administrative record is **DENIED**.

## I.  BACKGROUND

### A.  History of the Facility

The United States Department of Energy maintains the Oak Ridge Institute for Science and Education (ORISE), which acts as a liaison between national universities and DOE research laboratories to further research opportunities for students and faculty.  Admin. R. (AR) at 43.  For the first 57 years of its existence, ORISE was operated under a management and operating agreement between the Agency and the Oak Ridge Institute for Nuclear Studies, a state institution.  *Id.*  Oak Ridge Institute for Nuclear Studies has since been reorganized as the Oak Ridge Associated Universities, a consortium of colleges and universities.  *Id.*  In June of 1991, DOE determined that it would be beneficial to separate ORISE, as an entity, from its management, ORAU.  *Id.*  In January, 1999, DOE awarded a noncompetitive, cost-reimbursement contract to ORAU as part of a move away from the management and operating agreement model and towards free and open competition.  *Id.* at 43.  After a three-month extension, that contract expired on March 31, 2000, being replaced by a competitively-awarded, cost-plus fee contract that was also received by ORAU.  *Id.*  A follow-on contract, also a competitively-

---

† This opinion was initially filed under seal, to allow the parties the opportunity to propose redactions.  Intervenor has done so, although most of its request was found unwarranted.  *See* Order (July 5, 2017).  The opinion is now issued for publication, with some minor, non-substantive corrections.  Redacted material has been replaced in this manner:  "[XXXXX]."

awarded, cost-plus fee contract, was awarded to ORAU --- which, after two extensions, was set to expire on June 30, 2016.  *Id*. at 43, 2201.

## B.  The Solicitation

The United States Department of Energy issued Solicitation No. DE-SOL-0006230 (the solicitation) on July 22, 2015.  AR at 228.  The solicitation sought proposals to support the scientific efforts of ORISE.  AR at 235.  The awardee was to assist DOE in five principal areas, which were described in detail in the Performance Work Statement (PWS): science, technology, engineering, and mathematics (STEM) workforce development; scientific and technical resource integration; radiation emergency assistance and training; human subject protection surveillance; and independent environmental assessment and verification.  *Id*. at 235–39.  The contract was to be awarded on a cost-plus fee basis, with a transition period, a five-year base period, and up to five additional one-year "award term" periods.  *Id*. at 230–31.  During the period between the issuance of the solicitation and the due date for proposals, the solicitation was amended seven times.  *See id*. at 2205.

The solicitation informed offerors that the Agency intended to evaluate proposals, and make an award, without conducting discussions.  AR at 851.  Offerors were instructed to submit their proposals in three separate volumes.  Volume I was to contain the "Offer and Other Documents," Volume II was for "Capabilities and Approach," and Volume III was to cover "Cost and Fee."  *Id*. at 731.

Pursuant to the solicitation's instructions, offerors were to submit nine separate documents in Volume I.  AR at 776.  First, a fully executed "Proposal Form" was to be included.  *Id*.  Next, offerors were to include certain representations and certifications.  *See id*. at 688–701 (providing 11 different representations and certifications, some with subparts, that offerors were to execute); *id*. at 776.  Third, offerors were to provide price information, including a proposed award fee, consistent with the cost information contained in Volume III.  *Id*. at 230–33 (blank pricing form to be used by offerors); *id*. at 776–77.  Fourth, offerors were to submit a pledge to select subcontractors on a competitive basis as much as possible, and to justify any non-competitive selections.  *Id*. at 776–77.

The fifth document was to contain any exceptions to, or deviations from the model contract.  AR at 776–77.  Next would be a summary of exceptions taken in other volumes.  *Id*.  Seventh, each offeror was to provide a numbered listing of its commitments to provide anything at no cost to the government.  *Id*.; *see also* AR at 789.  Eighth, offerors were to provide a completed "Small Business Contracting Plan."  *Id*. at 776.  The solicitation required that this plan address the elements

listed in 48 C.F.R. § 52.219-9(d).  *Id.* at 777.[1]  And finally, offerors were required to execute a certification of intent to maintain the pay and benefits of employees of the incumbent contractor who are hired by the contract awardee.  *Id.* at 295–296, 776, 778.

Volume II, the Capabilities and Approach proposal, was limited to 70 pages in length, not counting the table of contents and certain other material.  AR at 778–79.  In this proposal, offerors were to address seven specific areas, *id.* at 779–89, which were to be used as the evaluation criteria for the proposal, *id.* at 851–56.  Concerning Volume III, the Cost and Fee proposal, offerors were not required to certify their data, as the Agency selected Alternate IV of Federal Acquisition Regulation (FAR) section 52.215-20.  *Id.* at 789; *see* AR at 755 (incorporating 48 C.F.R. § 52.215-20, Alternate IV (OCT 2010)).  The offerors were instead given a detailed description of the information to be provided.  *Id.* at 755–68.

The solicitation identified two evaluation factors to be used in the best-value determination: a technical factor, which was called Capabilities and Approach; and the Cost factor.  AR at 851.  The seven specific topic areas under the Capabilities and Approach factor --- which would customarily have been called "subfactors," *see* 48 C.F.R. §§ 15.303(b)(4), 15.304 --- were designated as "criteria," and the elements under them were called "subcriteria."[2]  In weighing these factors, "Capabilities and Approach Evaluation Criteria are significantly more important than the Probable Cost."  AR at 851.  For purposes of relative weight, the Capabilities and Approach Evaluation Criteria were broken down into two tiers.  The first tier, which contained the most important criteria, was composed of "Strategic Vision for ORISE as a DOE Institute"; "Leadership, Management, and Direction"; and "Program Implementation."  *Id.* at 852.  Each of these criteria were of equal importance to one another.  *Id.*  The second tier of criteria, less important than the first tier, consisted of "Relevant Experience," "Past Performance," "Transition," and "Offeror's Commitments."  *Id.*  Again, each of the criteria in the second tier were of equal importance to one another, but the four of them collectively were less important than any one of the criteria in the first tier.  *Id.*

The first criterion, "Strategic Vision for ORISE as a DOE Institute," had four subcriteria.  First, the Agency was to evaluate the extent to which the offeror's comprehensive strategic vision would enable ORISE to achieve the "DOE goals as articulated in the Performance Work Statement."  AR at 852.  Second, DOE would evaluate the extent to which the offeror's plan for achieving that vision would

---

[1] The solicitation included a model version of such a small business plan for use by offerors in submitting their proposals.  AR at 678–86.

[2] For the sake of consistency, the Court will use the Agency's nomenclature throughout this opinion.

enable it to leverage limited resources to accomplish the goals articulated in the PWS. *Id.* Third, the Agency was to evaluate the offeror's proposed measures and metrics of success. *Id.* at 853. Fourth, DOE was to evaluate the offeror's proposed use of available and newly-developed data to promote the continuous improvement of ORISE. *Id.*

The second criterion in the first tier, "Leadership, Management, and Direction," had only two subcriteria. The first of these considered the qualifications of the offeror's proposed key personnel, as reflected in their oral presentations and résumés. *Id.* Under the second subcriterion, DOE would evaluate the extent to which the offeror's proposed leadership team would "enhance the offeror's ability to overcome barriers and challenges affecting accomplishment of the PWS." *Id.*

The final criterion in the first tier, "Program Implementation," had three subcriteria. AR at 853. Under the first, DOE was to evaluate "the comprehensiveness, innovativeness, and feasibility of the offeror's approach to efficiently and effectively managing and executing the contract requirements so as to achieve success in all areas of the work scope." *Id.* The second of the subcriteria called for the Agency to evaluate "the offeror's plan for the use of small businesses in work directly impacting the DOE mission." *Id.* Under the final subcriterion, the Agency was to evaluate the offeror's proposed staff, facilities, equipment, use of government-furnished property and equipment, and compensation of professional employees. *Id.*

The first of the four criteria in the second tier, "Relevant Experience," had five subcriteria. AR at 854. The first subcriterion evaluated each offeror's relevant experience in performing work similar in size, scope, and complexity to that stated in the PWS. *Id.* Under the second subcriterion, DOE evaluated the relevant experience of proposed subcontractors, again based on work that was similar in terms of size, scope, and complexity to the work specified in the PWS. *Id.* Under the third subcriterion, the Agency would compare the prior experience of the offeror, or the offeror's subcontractors, to the work that each was to perform under the proposal. *Id.* The fourth subcriterion noted that in the case of a newly-formed entity, which lacked experience of its own, the Agency would evaluate the entity's members or parents. *Id.* The final subcriterion informed offerors that the DOE "may use information obtained from reference checks to verify experience." *Id.* at 854.

Under the next criterion in the second tier, "Past Performance," the Agency was to evaluate the offeror's past performance, and that of its teaming partners, using seven subcriteria. AR at 854–55. First, DOE would evaluate the quality of products or services rendered on prior contracts. *Id.* at 855. Second, the Agency would evaluate the timeliness of the delivery of those goods or services. *Id.* The third subcriterion was the extent to which the offeror was able to control costs when

performing prior contracts. *Id.* Fourth, the Agency was to evaluate the extent to which the offeror employed efficient and proper business practices. *Id.* The fifth subcriterion DOE would examine was overall customer satisfaction concerning past contracts. *Id.* Sixth, the Agency would evaluate the extent to which an offeror had safely conducted operations when performing prior contracts. *Id.* Finally, DOE would examine the extent to which an offeror had been able to maintain the security of sensitive data when performing prior contracts. *Id.*

The third criterion in the second tier concerned the offeror's "Transition Plan." AR at 855. Under this criterion, DOE was to evaluate the transition plan for "feasibility, comprehensiveness, efficiency and effectiveness, including the extent that it provides for a smooth and orderly transition." AR at 855–56.

The fourth and final criterion in the second tier was "Offeror's Commitments." AR at 856. Such commitments were defined in section L.31(c)(7) of the solicitation as "any proposed resources, services, support, and/or commitments . . . that will be provided at no cost to" the Agency. *Id.* at 789. Under this criterion, credit would only be given to an offeror's commitments that would be incorporated into the contract. AR at 856. The solicitation also informed offerors that, to the extent that commitments were proposed from any party other than the offeror --- for example, by "parent corporations, affiliated corporations, universities, or other institutions" --- a letter must be provided, on official letterhead, from a person authorized to make the commitment on behalf of that other party. AR at 789.

After the solicitation was issued, but before proposals were submitted, prospective offerors were provided the opportunity to submit written questions to DOE concerning the procurement. On September 1, 2015, DOE finalized a list of 42 written questions and responses, some of which had more than one part, which was made available to prospective bidders. AR at 870–81. A total of seven questions were asked concerning the number of incumbent contractor employees, and the costs of employee compensation or facility maintenance incurred in connection with the predecessor contract for the operation of ORISE. *See id.* at 871–72, 878–80. This information was sought because the government would be furnishing certain property to the contract awardee for use as part of the contract, which the awardee would be responsible for maintaining, AR at 239–40, 564–84 (listing property the government would furnish to the awardee), and because the awardee was obligated to offer to retain certain incumbent personnel at comparable levels of pay and benefits, AR at 272–73 (citing 48 CFR § 52.222-17).

The Agency did not provide any additional information concerning the number of incumbent employees and their benefits, explaining that such information was "a contractor record" that could not be released under the terms of the previous contracts. AR at 871, 879–80. Regarding government-furnished facilities, all of which were located at what was known as the "ORISE South

Campus," a question was asked about the awardee's responsibility for two buildings which were described as "pending disposal," and the timeframe for any disposal. AR at 871–72; *see id.* at 584 (listing buildings SC-9 and SC-16 as "pending disposal"). In response, the Agency directed offerors to a document on its website entitled the "Ten-Year Site Plan," which indicated the government's plans regarding the timing of the disposal activities relating to those buildings. *Id.* at 872; Pl.s' Ex. A at 5. That plan noted that, in fiscal year 2014, 608 Full Time Equivalent (FTEs) worked in support of the ORISE contract, and that this number was expected to rise to 747 by 2024. Pl.'s Ex. A at 3–4. In response to a question concerning annual expenses for maintenance activities, the Agency withheld incumbent contractor information as "a contractor record" that could not be released, and referred offerors to cost projections contained in the Ten-Year Site Plan. AR at 878.

## C. Evaluation of Proposals and Award of Contract

### *1. SEB Evaluations*

On September 18, 2015, DOE received two proposals, one from DRI and the other from ORAU. AR at 886, 1451. Under the Source Selection Plan (SSP), the Source Evaluation Board (SEB) was to consist of three voting members (including a chairperson), eleven advisors, and five ex-officio members. AR at 44–45. The plan also noted that additional advisors might be appointed, should additional assistance be required during the evaluation of proposals. *Id.* at 45. Joseph McBrearty, Deputy Director for Field Operations at DOE's Office of Science, appointed Dr. Julie A. Carruthers as the Source Selection Official (SSO) for this procurement. AR at 2200. Doctor Carruthers in turn appointed the three SEB voting members, the initial eleven advisors, and three additional advisors. *Id.* at 2200–01.[3]

The SSP contemplated an eleven-step process for evaluating these proposals, beginning with an initial review to ensure that the proposals were complete and in compliance with the solicitation instructions. AR at 52. Pursuant to that first step, the SEB executive secretary reviewed both proposals to verify compliance with the solicitation's basic requirements and to determine whether the proposals were "obviously or grossly deficient." AR at 2213. Apparently, neither proposal was found to present such problems during this initial review. *See* AR at 2213–14, 2327, 2333.

The SSP provided five adjectival ratings that evaluators would use to rate the Capabilities and Approach factor. AR at 59–60. The possible ratings were

---

[3] The five ex-officio members of the SEB were part of the board by virtue of their positions within DOE. AR at 2201.

"Excellent," "Good," "Satisfactory or Neutral," "Marginal," and "Unsatisfactory."[4] *Id.* An "Excellent" proposal was to be one which "demonstrates a comprehensive understanding of" requirements, or "a highly effective approach," such that there was "a very high probability of successful contract performance" and a "likelihood that performance expectations will be significantly exceeded." AR at 59. For such proposals, "the chance of unsuccessful performance is extremely low," and they "normally exhibit significant strength(s) and/or multiple strengths, and no deficiencies, significant weaknesses, or weaknesses." *Id.*

"Good" was the rating for a proposal which "demonstrates a noteworthy understanding of . . . requirements" or "an effective approach," with a "high probability of successful contract performance" and with expectations likely to be exceeded. *Id.* Such a proposal would "exhibit significant strength(s) and/or strength(s) that collectively provide notable benefit to the Government, few, if any significant weaknesses, and/or weaknesses, no deficiencies," and present a "very low" risk of unsuccessful performance. *Id.*

Proposals rated "Satisfactory" were to demonstrate "an adequate understanding of . . . requirements" and "an acceptable approach," with "a likely probability of successful contract performance." These would "exhibit significant strength(s) and/or strength(s) and offsetting significant weaknesses and/or weaknesses or deficiencies," or have minimally important (or no) strengths or weaknesses, and have a risk of unsuccessful performance which is considered "low." *Id.* at 59–60.

A "Marginal" proposal would be one which "demonstrates a limited understanding of the contract" or an approach with "an unlikely probability of achieving successful contract performance." AR at 60. These proposals "would normally" contain "few, if any, significant strengths and/or strengths, which are outweighed by the impact of weaknesses, significant weakness(es), or deficiency(ies)," and present a "significant" risk of unsuccessful performance. *Id.* Finally, "Unsatisfactory" proposals would "demonstrate[] an inadequate understanding of . . . requirements" and be "highly unlikely" to achieve successful performance. *Id.* These would have "no significant strengths or strengths, numerous significant weaknesses and/or weaknesses, and at least one deficiency," and would present an "unacceptable level of risk." *Id.*

Pursuant to the SSP, no adjectival ratings were to be employed for the evaluation of cost proposals. AR at 50. Proposals were to be evaluated for cost realism and cost reasonableness, to assess whether each offeror understood requirements, and to derive a probable cost. *Id.* The members of the SEB were not

---

[4] The adjectival ratings were not described in the solicitation, *see* AR at 851–56, nor otherwise released to offerors.

to view cost information until they had finalized their technical evaluations.  *Id.* at 60.  The SEB's technical evaluation of cost information could involve up to five separate aspects.  These were an examination of an offeror's total full-time equivalents (FTEs) and labor mix; a technical analysis to determine the reasonableness of proposed resource use; the ensuring of consistency with the strengths and weaknesses identified in the Capabilities and Approach factor review; the comparison of the offeror's cost information to the independent government cost estimate; and the development of justification for any cost adjustments.  *Id.* at 60–61.  The SEB would also review the draft "Cost Report" prepared by the SEB advisors, "to determine if the cost is fair and reasonable."  AR at 61; *see also id.* at 55.

The SEB first evaluated Volume II of the offerors' proposals under the Capabilities and Approach factor.  *Id.* at 2214.  This process began with each voting member of the SEB conducting a thorough review of both proposals.  *Id.* at 2215.  During this review of Volume II of the proposals, no SEB member identified any aspects of the proposals which required clarification.  *Id.*  Next, voting members of the SEB, the SSO, the SEB's legal advisor, the Contracting Officer, and the Executive Secretary, attended both offerors' oral presentations on October 7, 2015 and October 8, 2015.  AR at 2205, 2215–16.  The SEB then evaluated each offeror's past performance information.  *Id.* at 2216.  After they had independently reviewed the proposals, and after the offerors had made their oral presentations, the voting members of the SEB met to conduct a consensus evaluation and arrive at a consensus rating for each proposal.  *Id.* at 2216–17.  Though the Source Selection Plan had a process for preparing dissenting opinions, no such opinions were generated by the SEB.  *Id.* at 58, 2217, 2333.

The SEB's 129-page consensus report was completed on February 18, 2016.  AR at 2193, 2323.  In its overview of the proposals received, the SEB noted that ORAU had proposed no major subcontractors or teaming partners, but DRI had proposed five major subcontractors.  AR at 2199.  The SEB summarized the results of its technical evaluations in a table format.  With respect to the first tier of criteria, the SEB assigned DRI a rating of Satisfactory for Strategic Vision, and ORAU received an Excellent.  *Id.*  Under Leadership, Management, and Direction, DRI received a Marginal rating and ORAU received a rating of Satisfactory.  *Id.*  And for Program Implementation, DRI received a Satisfactory rating and ORAU was rated as Good.  *Id.*  In short, for each of the most important technical criteria, ORAU received a better rating than DRI.

Turning to the four criteria in the second tier, for Relevant Experience the SEB assigned DRI a rating of Satisfactory and ORAU was rated as Excellent.  AR at 2199.  Under Past Performance, both offerors received a Good rating.  *Id.*  Under the Transition Plan criterion, DRI received a Good rating, while ORAU was assigned but a Marginal rating.  *Id.*  And finally, DRI received a Satisfactory rating

for Offeror's Commitments, and ORAU was rated as Excellent. *Id.* Thus, for the less important technical criteria, ORAU received an equal or superior rating to DRI for all but one criterion.

The SEB began its review of both proposals by reviewing Volume I of each. AR at 2224. The SEB determined that both offerors had submitted, in most respects, complete proposals.[5] As is relevant to this protest, it was observed that both offerors had submitted small business plans. AR at 2224–25. The SEB did note, however, that DRI had failed to submit properly authorized letters of commitment from entities other than DRI that were purportedly offering property or services at no cost to the government. *Id.* at 2224. The SEB considered this omission in its evaluation of Volume II of DRI's proposal. *Id.*

Concerning the SEB's evaluation of Volume II, DRI's protest focuses on five of the criteria, the relevant findings of which are discussed below. The SEB assigned four weaknesses to DRI's proposal under the Strategic Vision criterion. AR at 2227–28. The first weakness related to DRI's proposal to move the Radiation Emergency Assistance Center/Training Site (REAC/TS) facility to a new, as yet unspecified, location. AR at 2229. The SEB found that DRI provided insufficient details about this proposed move, such as the resources involved, creating doubt as to DRI's ability to leverage limited resources to accomplish the contract objectives and increasing the chance of unsuccessful contract performance. *Id.* The SEB also assigned DRI a weakness under this criterion for providing insufficient information concerning how it would achieve both its overall long-term vision for ORISE as an enterprise and the goals stated in the PWS, AR at 2230; for not communicating a vision for Science and Technical Resource Integration (STRI) to meet peer review goals, AR at 2230–31; and for purportedly proposing to expand certain REAC/TS and Independent Environmental Assessment and Verification (IEAV) activities beyond those stated in the PWS, AR at 2231.

The SEB assigned DRI several weaknesses under the Leadership, Management, and Direction criterion. AR at 2242.[6] One weakness was based on a combination of findings --- none of the members of DRI's proposed management team were able to satisfactorily answer a question concerning the DOE's Office of Sciences peer review process, four key individuals lacked the requisite qualifications on paper, and another failed to show leadership ability during the oral presentations. AR at 2244–45. The SEB likewise assigned a weakness to DRI's

---

[5] The SEB did note that DRI failed to include a cover letter with its Volume I, but considered this omission to be administrative in nature and accordingly did not penalize DRI for it. AR at 2224.

[6] Although in its rating discussion the SEB states that five weaknesses were found, AR at 2242, only four appear to be described, *see id.* at 2243–46.

proposal because its proposed director's résumé, though listing both governmental and private sector executive experience, did not clearly reflect experience leading a large organization with a wide mission scope, as required for the ORISE contract. *Id.* at 2246. Another weakness was based on DRI's having proposed a new emergency preparedness position, to be held by a key person, which the SEB did not find adequately explained. AR at 2244.

In the evaluation of DRI's proposal under the Program Implementation criterion, the SEB identified four weaknesses and one significant weakness. AR at 2252. The significant weakness was assigned because the SEB determined that DRI had failed to provide sufficient detail in explaining the proposed labor mix and staffing levels. AR at 2255–56. Under this criterion, the SEB assigned a significant weakness to ORAU due to the offeror's limited reliance on small businesses. AR at 2261. The SEB determined that this was a significant flaw in the proposal as ORAU's proposed small business participation was limited to ancillary aspects of the contract. *Id.* By contrast, one of DRI's two strengths under this criterion was for its proposed use of multiple small businesses to do core contract work. AR at 2253.[7]

With respect to the Transition Plan criterion, the SEB assigned ORAU a significant weakness and no strengths, weakness, or deficiencies, resulting in a rating of Marginal. AR at 2273. This low rating was due to the SEB treating the ORAU proposal as lacking a formal transition plan, as the submitted Volume II exceeded the relevant page limit, resulting in the excessive pages (including the formal plan) being disregarded. AR at 2273–75. The SEB determined, however, that sufficient information was provided concerning transition in those parts of the proposal that were evaluated, such as the proposed use of a dedicated transition manager and continued use of existing facilities, to justify finding the proposal to be Marginal, rather than Unacceptable, under this criterion. *Id.*

Regarding the final relevant criterion, Offeror's Commitments, DRI was assigned a weakness because the proposal did not include commitment letters from the third parties that DRI claimed would be providing goods or services, at no cost to the government, for use in the ORISE contract. AR at 2277. The SEB noted that such letters were required by the solicitation and that the failure to include them increased the risk of unsuccessful contract performance. *Id.*

After completing its technical evaluations, the SEB evaluated Volume III of the offerors' proposals --- the cost and fee information. AR at 2278–79. In its evaluation of DRI's cost and fee information, the SEB noted that the proposal appeared to be missing a workbook, entitled "Estimate Assumptions," that was to

---

[7] Under this criterion, ORAU was assigned six strengths, two weaknesses, and the one significant weakness. AR at 2256–61.

provide information concerning the basis for DRI's estimated costs.  AR at 2296. The omission of the workbook, DRI's reliance on its unexplained "professional judgment," and the lack of a narrative explanation for its methodology left the SEB without the ability to assess DRI's proposed costs.  AR at 2296–97.  Accordingly, the SEB determined that no adjustments would be made to DRI's costs to arrive at a most probable cost of performance, but also determined that most of DRI's proposed costs were unrealistic for lack of support.  *See id.* at 2296–309.  With respect to labor hours, the SEB noted that DRI had based its overall headcount on historical data regarding FTEs under the predecessor contract but that DRI's technical approach to the current ORISE contract was not similar to that previously employed.  AR at 2300–01.  Accordingly, in the view of the SEB, historical costs would be an improper basis upon which to analyze whether DRI's costs were realistic.  *Id.*

### 2.  Source Selection Decision

On March 2, 2016, the SSO, in her 21-page Source Selection Decision, determined that the contract would be awarded to ORAU.  AR at 2326, 2345.  As did the SEB, the SSO noted that the material submitted by ORAU which exceeded the page limit was not considered during the evaluation.  AR at 2333.  The SSO determined that the SEB's evaluation was properly conducted and consistent with the evaluation criteria listed in the solicitation.  *Id.*  She noted that she agreed with all of the evaluation rankings the SEB had assigned to the two proposals, but had made certain additional observations about those proposals.  AR at 2334.  Based on her review of the proposals and the SEB's ratings, the SSO determined that ORAU's proposal was technically superior to DRI's.  AR at 2336.  She based this determination largely on the fact that ORAU received superior ratings in five of the eight technical criteria, including all three of the more important criteria.  *Id.*  With regard to the evaluation of DRI's proposal under the Strategic Vision criterion, the SSO observed that DRI's proposed focus on primary and secondary STEM outreach and education was not well aligned with the ORISE contract's focus, which is principally on education at the undergraduate level and above.  AR at 2336–37.  With respect to the Program Implementation criterion, the SSO echoed the SEB's concerns that ORAU had failed to make sufficient use of small businesses in DOE mission-related work areas.  AR at 2339.  The SSO noted that DRI was superior with respect to its use of small businesses, but that its proposal was inferior under this criterion taken as a whole.  AR at 2339–40.

Turning to the Cost factor, the SSO noted that the proposed costs were "very close" between the two proposals.  AR at 2343.  She agreed with the SEB's determination that most of DRI's costs were unrealistic, that a probable cost figure for DRI could not be derived, and that ORAU's proposed cost was reasonable.  *Id.* The SSO then proceeded to the best value determination.  Due to the inability to confirm that the proposed costs were realistic, the SSO concluded that DRI's

"proposal is unacceptable and cannot be considered for award."  AR at 2344.  She nevertheless conducted a best-value tradeoff using DRI's proposed cost, and determined that the benefits from ORAU's technical approach under the three first-tier criteria and the second-tier criterion of Offeror's Commitments "far outweigh any perceived savings" from DRI's lower proposed cost.  *Id.*[8]  The SSO noted that ORAU also proposed a lower maximum award fee, and that the risk posed by ORAU's lack of a formal transition plan was manageable.[9]  She concluded that "the overall technical superiority of the ORAU proposal is of better value to the Government" than DRI's proposal, and accordingly awarded the ORISE contract to ORAU.  AR at 2344–45.

### *3.  Debriefing*

On March 10, 2016, DRI was informed by letter that its offer had been rejected and that ORAU had been selected to receive the contract.  AR at 2386.  Attached to the letter was a written debriefing document, which informed DRI of its technical evaluation ratings and the strengths and weaknesses assigned by the SEB.  AR at 2388–405.  That document also disclosed the Agency's cost analysis of DRI's proposal, and noted the inadequacies in the information provided --- including the absence of the workbook --- that had led the SEB and the SSO to determine that DRI's costs of performance could not be determined with any certainty.  AR at 2406–07.  An oral debriefing was offered, *see* AR at 2387, which DRI apparently received within a week, Compl. ¶ 5.

## D.  The Protest Filed with the Court

On March 24, 2016, the Board of Regents of the Nevada System of Higher Education filed a bid-protest on behalf of DRI, contending that the DOE's decision to award the ORISE contract to ORAU was arbitrary, capricious, and violative of law and regulation.  Compl.  In that complaint, plaintiff asserts five separate protest grounds.  Compl.  ¶¶ 5(A)–(E).  First, plaintiff alleges that DOE evaluated the proposals based on unstated evaluation criteria, because the solicitation did not include the definitions of the adjectival ratings or explain how an offeror could obtain a particular rating.  *Id.* ¶¶ 6, 8.  Under this ground, DRI argues that the Agency failed to rank the proposals, making any best value determination arbitrary.  *Id.* ¶¶ 9–10.  Second, plaintiff claims that the Agency erred in failing to request a clarification from DRI, after the Agency discovered that the workbook

---

[8]  The total probable cost of ORAU's proposal, including the maximum award fee, was $3,214,160,771, which was 2.7% higher than DRI's proposed cost and fee of $3,130,764,506.  *See* AR at 2334.

[9]  The maximum award fee under the ORAU proposal was $57,091,516, compared to $76,059,587 under the DRI proposal.  AR at 2344.

"Estimate Assumptions.xlsx" was omitted from Volume III of DRI's proposal. *Id.* ¶ 11. Plaintiff alleges that during the debriefing, the Agency stated that it did not request a clarification regarding this because it believed that doing so would have constituted discussions, requiring the Agency to communicate with ORAU as well. *Id.* ¶ 12.

Third, plaintiff alleges that the Agency's refusal to disclose certain information regarding the number of FTEs employed under the predecessor ORISE contract, as well as their compensation and labor mix, was improper. Compl. ¶¶ 15–17. In support of this claim, plaintiff notes that its proposal was criticized for its proposed labor mix and method for estimating labor costs, which it claims was the result of the Agency's refusal to disclose the incumbent's labor information. *Id.* ¶¶ 17, 19. Under the fourth ground, plaintiff challenges several evaluation determinations that it contends were erroneous or reflect disparate treatment. *Id.* ¶¶ 20, 22, 25, 29–30. Plaintiff takes issue with the following six evaluation decisions: the negative evaluation DRI received for its technical understanding of DOE's peer review process, *id.* ¶¶ 20–21; the assignment of a weakness to DRI's proposal regarding its proposed move of the REAC/TS to a larger space, *id.* ¶¶ 22–24; the SSO's assessment of qualifications of DRI's proposed program director, *id.* ¶¶ 25–26; the SSO's characterization of DRI's emergency management proposal, *id.* ¶¶ 27–28; the SSO's determination that DRI's proposal contained both a strength and a weakness regarding STRI, *id.* ¶ 29; and the assignment of weaknesses to DRI for failure to follow DOE's "Strategic Vision" or advance its "goals," which plaintiff alleges were not defined in the solicitation, *id.* ¶¶ 30–31. Plaintiff's fifth ground alleges that the SSO was excessively involved in the procurement and acted in a partisan manner, rendering her decision insufficiently "independent" to comply with 48 C.F.R. § 15.308. Compl. ¶¶ 32–36. Plaintiff requested a remand to the Agency to correct the purported evaluation errors, as well an award of bid preparation and proposal costs and of its attorney's fees for bringing this protest. *Id.* ¶ 37

In its motion for judgment on the administrative record, plaintiff makes five arguments in support of its protest, which differ somewhat from those in the complaint.[10] Pl.'s Mot. for J. on the R. (Pl.'s Mot.) at 2, 8, 12, 15, 22. First, it argues that ORAU's proposal failed to contain certain required information, and accordingly should have been either rejected as nonresponsive or evaluated less favorably. *Id.* at 2–8. Next, plaintiff argues that, once the Agency realized the workbook containing supporting cost information was omitted from DRI's Volume III, the Agency should have either immediately eliminated DRI from consideration

---

[10] To the extent any specific matters alleged in the complaint were not raised in plaintiff's briefs on the motions for judgment, such claims have dropped out of this case. *Res Rei Dev., Inc. v. United States*, 126 Fed. Cl. 535, 546 n.17 (2016) (citing *Commissioning Sols. Glob., LLC v. United States*, 97 Fed. Cl. 1, 2–3 n.2 (2011)).

or sought a clarification. *Id.* at 8–12. Third, plaintiff argues that DOE improperly refused to release certain information related to the staffing levels, labor mix, and compensation paid under the predecessor ORISE contract, negatively impacting DRI's proposal. *Id.* at 12–15. Under this ground, DRI also contends that it based its proposed staffing on the 608 FTEs that the Ten-Year Site Plan, referenced by the Agency, stated were employed in 2014 under the predecessor contract. *Id.* at 14–15. Plaintiff contends that this document either misled it, or shows that ORAU's much lower proposed direct labor of [XXX] FTEs was judged under a different standard from DRI's proposal. *Id.*

Plaintiff's fourth argument concerns a number of challenges to specific determinations of the SEB. Pl.'s Mot. at 15–24.[11] The first of these is DRI's claim that its proposal was improperly criticized for not including commitment letters from other entities that were promising to provide certain property or assistance at no cost to the government. *Id.* at 16–17. Next, DRI contends that its proposal was improperly downgraded by the evaluators for suggesting that DRI would study a move of the REAC/TS facility to a larger location. *Id.* at 18–19. Third, plaintiff disputes the weaknesses identified for its proposed management team. *Id.* at 19–20. Plaintiff's next argument is that its key personnel were improperly faulted for not being familiar with DOE's Office of Sciences peer review process. *Id.* at 20–21. Plaintiff also contends that ORAU should not have received a strength under the Program Implementation criterion for its use of a part-time workforce. *Id.* at 21–22. Finally, DRI maintains that the Agency treated offerors disparately by not imposing on the incumbent the expenses of relocating operations from the ORISE North Campus facilities owned by ORAU to the South Campus facilities owned by DOE. *Id.* at 22.

In its fifth argument, DRI reapplies all of its criticisms of the SEB's findings to the SSO, for having adopted them. Pl.'s Mot. at 22. It argues that the SSO mischaracterized the SEB's findings concerning DRI's capability to leverage limited resources. *Id.* at 23. Plaintiff further contends that the SSO based her assessment of its proposal on her subjective views of DOE's goals, and improperly criticized DRI for focusing more on primary and secondary STEM education. *Id.*

Defendant, and defendant-intervenor, have filed motions for judgment on the administrative record, in which they argue that all of plaintiff's contentions are either untimely, without merit, or both. Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Admin. R. and Cross Mot. for J. on the Admin. R. (Def.'s Mot.); Intervenor's Resp. and Cross Mot. for J. on the R. (Int.'s Mot.). Together, they argue that any protest grounds based on the Agency's failure to disclose information or evaluative

---

[11] This argument begins with some "general comments" that evaluation factors "were amorphous, vague, extremely subjective, and slanted," and that DOE's "goals" and "vision" were not defined in the solicitation. Pl.'s Mot. at 15–16.

criteria, or challenges to the substance of those criteria that were disclosed, are untimely under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  Def.'s Mot. at 19, 28; Int.'s Mot. at 31–33.  Regarding the challenges to the technical evaluations, they contend these represent mere disagreements with the Agency's technical judgments, and accordingly do not state a valid protest ground. Def.'s Mot. at 11–22, 25–33, 34–41; Int.'s Mot. at 21–31, 34–48.  Defendant and defendant-intervenor also contend that the Agency properly determined that ORAU's proposal met all solicitation requirements and accordingly was acceptable for award.  Def.'s Mot. 11–17; Int.'s Mot. at 21–26.  After reply papers were filed by all parties, the Court held a hearing on the motions, at which all three parties participated.  This opinion issues after a careful review of the arguments made at the hearing and in the briefs and the authorities cited, as well as a thorough consideration of the pertinent documents in the administrative record.

## II.  DISCUSSION

### A.  Legal Standards

#### *1.  Judgment on the Administrative Record in a Bid Protest*

Bid protests are heard by this court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, § 12(a)–(b), 110 Stat. 3870, 3874.  The relevant provision requires our court to follow Administrative Procedure Act (APA) standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be --- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2012).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had

determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards, *see Citizens to Pres. Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 415 (1971). Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. § 706(2)(A)). *But see Impresa Construzioni Geom. Domenico Garufi v. United States* (*Domenico Garufi*), 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests). The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing, *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park,* 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974). The court must determine whether "the procurement official's decision lacked a rational basis." *Domenico Garufi,* 238 F.3d at 1332 (adopting APA standards the D.C.

- 17 -

Circuit developed); *see also Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi,* 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi,* 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C. Cir. 1994)). The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision. *See Overstreet Elec. Co. v. United States,* 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States,* 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States,* 37 Fed. Cl. 771, 779 (1997)), *aff'd,* 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum,* 404 F.3d at 1351–54.

### *2. Injunctive Relief*

In a bid protest, the court has the power to issue a permanent injunction pursuant to 28 U.S.C. § 1491(b)(2). In determining whether to grant a motion for a permanent injunction, the court applies a four-factored standard, under which a plaintiff must show: (a) that it has actually succeeded on the merits; (b) that it will suffer irreparable harm if the procurement is not enjoined; (c) that the harm it will suffer, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (d) that granting injunctive relief serves the public interest. *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 551–53 (2011). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United*

*States,* 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States,* 87 Fed. Cl. 344, 378 (2009).  Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction.  *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 953 (Fed. Cir. 1990).  A lack of success on the merits, however, precludes the possibility of an injunction.  *See Amoco Prod'n Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (explaining that a permanent injunction requires "actual success" on the merits); *Tech Sys., Inc. v. United States,* 98 Fed. Cl. 228, 268 (2011); *Gulf Grp.,* 61 Fed. Cl. at 364.

## B.  Analysis

Plaintiff makes five separate arguments in support of its protest.  The first three involve claims that the Agency did not follow either the terms of the solicitation or the FAR, and the final two challenge several evaluation decisions as arbitrary.

### *1.  ORAU's Proposal Included All Required Information*

Plaintiff contends that ORAU's proposal failed to include two items required by the solicitation --- a Small Business Subcontracting Plan and a transition plan. Pl.'s Mot. at 2, 6.  With respect to the first point, defendant and intervenor both correctly point out that plaintiff is confusing the Small Business Subcontracting Plan with an offeror's proposed use of small businesses.  Def.'s Mot. at 11–15; Int.'s Mot. at 22–24.  The former was required to be included in Volume I of an offeror's proposal, while the latter was a subcriterion of the Program Implementation criterion used to evaluate Volume II.  *Compare* AR at 776–77 (describing the Small Business Subcontracting Plan) *with* AR at 853 (explaining small business use subcriterion).  As the SEB noted in its evaluation of ORAU's proposal, a fully executed Small Business Subcontracting Plan was included with that proposal.  AR at 2224–25; *see also* AR at 1472, 1482–92 (ORAU Small Business Subcontracting Plan).

Plaintiff stresses that under the Program Implementation criterion, offerors were to be evaluated on the extent to which they proposed using small business in areas "directly impacting" the DOE's mission, and that ORAU proposed using small business subcontractors only in support roles.  Pl.'s Mot. at 5–6; *see* AR at 853 (evaluation subcriterion for use of small business under the Program Implementation criterion); AR at 1563–65 (ORAU proposes using small business subcontractors for services such as information technology, meeting planning and travel services).  The SEB determined that this limited use of small businesses was a "significant weakness" in ORAU's proposal.  AR at 2261.  Plaintiff argues that this should be downgraded to a deficiency.  Pl.'s Mot. at 5–6.  But DRI has identified no objective errors or subjective inconsistencies connected with this particular rating, and thus there is no basis for the Court to find it arbitrary or unlawful.  *See*

*USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 461 (2010). Plaintiff's challenge amounts to a request that the evaluation be second-guessed, which is not the province of a reviewing court. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996).

The second point raised by DRI is its contention that ORAU's proposal should have been excluded from award consideration based on the failure to include a transition plan. Pl.'s Mot. at 6–8. One of the seven "[s]pecific [a]reas to be [a]ddressed" by offerors in Volume II was a transition plan, which was to be "a detailed and comprehensive plan." AR at 779, 788. Offerors were told that this plan "should describe" a "management approach" and the maintenance of a "continuity of operations," and "should include" seven different transition activities. AR at 788. Under the Transition Plan evaluation criterion, this plan was to "be evaluated with respect to its feasibility, comprehensiveness, efficiency and effectiveness, including the extent to which it provides for a smooth and orderly transition, identifies key issues and milestones, identifies potential barriers to a smooth transition, proposes solutions to the barriers identified, and minimizes impacts on continuity of operations." AR at 856.

The transition plan of ORAU was described on pages 64 through 69 of Volume II of the proposal submitted. *See* AR at 1572–77. Intervenor, however, neglected to include in its page count the nine pages at the front of this volume which contained its list of acronyms and a "crosswalk" matching proposal portions with solicitation provisions. *See* AR at 1500–08. Such materials were not excludable from the 70-page limit, AR at 778–79, and accordingly the Contracting Officer determined that numbered page 61 was the last page of the volume that could be evaluated. AR at 2048. The remainder of the volume, including the pages describing the transition plan, were removed from the proposal before it was evaluated.[12] AR at 2274, 2333, 2341–42.

The SEB rated ORAU's proposal under the Transition Plan criterion as Marginal, with a significant weakness and no strengths --- deciding that the absence of a formal transition plan decreased the likelihood of successful contract performance, but that there was sufficient information in the remainder of the proposal regarding transition to mitigate this risk. AR at 2274–75. In particular, the SEB noted the presence of "information related to the use of existing facilities and systems, the transition manager, retention of current key personnel, continuation of employee pay and benefits, and confirmation that right of first refusal will be offered," as well as "information related to relevant experience in transitioning and performing work under the current contract." AR at 2273–74.

---

[12] The information on numbered page 70, concerning corporate commitments, AR at 1578, did not count toward the page limit, AR at 779, and was also reviewable, AR at 2048.

Plaintiff does not dispute that this information was contained in the ORAU proposal, which touched on most if not all of the transition activities that offerors were advised to include in a transition plan.  *See* AR at 788 (listing, among other things, plans for operational control of facilities, handling incumbent employees, transferring government property, and assuming control of business and management systems); AR at 1511, 1530–32 (ORAU proposal discussing transition approach to facilities, equipment and systems, retention of personnel and benefits, and transition manager).  The SSO concurred in the SEB's findings and conclusion, noting that the absence of a formal transition plan in the ORAU proposal was a significant weakness, but that there was sufficient information provided relating to transition activities to reduce the risks associated with this flaw to a manageable level.  AR at 2341–42.

Plaintiff argues that the absence of a formal transition plan from the ORAU proposal should have resulted in the proposal's exclusion from the competition, or at least in a finding of a deficiency and a lower rating.  Pl.'s Mot. at 7–8.  But DRI has provided no reason why the information in the ORAU proposal relating to transition could not be considered as meeting the basic requirements of a transition plan, albeit one not as detailed and comprehensive as the Agency desired.  The SEB gave a rational explanation of how information in the ORAU proposal addressed transition activities and reduced risk to the continuity of operations.  AR at 2274–75.  It also acknowledged that the absence of information concerning key issues, milestones, and potential barriers and their solutions, "appreciably increases the risk of unsuccessful contract performance," AR at 2275, justifying the finding of a significant weakness, *see* AR at 2217.  The SSO rationally explained how the information in the ORAU proposal allowed for an assessment of "the feasibility, comprehensiveness, efficiency and effectiveness of the offeror's transition activities," making the risk manageable.  AR at 2342.  While DRI may disagree with these assessments, it has not identified any objective errors or subjective inconsistencies that could render the judgment arbitrary.  *See USfalcon*, 92 Fed. Cl. at 461.[13]

---

[13]  Plaintiff argues that at least one SEB member might have improperly reviewed ORAU's formal transition plan, as his preliminary notes stated that ORAU's transition plan was "very thorough and should provide for a successful transition." Pl.'s Mot. at 7 (quoting AR at 2904).  But this was clearly a typographical error, as the page and section numbers cited in this draft evaluation, AR at 2904, match those containing the transition plan in *DRI's* proposal and not in ORAU's proposal, *see* AR at 981–92, 1572–77, and the identical comment was made about DRI's transition plan, *see* AR at 2887.

### 2.  The Agency's Failure to Seek Clarification from DRI Was Neither Improper Nor Prejudicial

Plaintiff's second protest ground concerns the failure of its proposal to contain a working link to data that was apparently contained in a workbook called "Estimate Assumptions.xlsx."  *See* Pl.'s Mot. at 8–12; Pl.'s Reply Br. to Mot. for J. on the R. (Pl.'s Reply) at 2–6.  The solicitation required that Volume III, each offeror's cost proposal, explain any "conditional assumptions" and contain as exhibits spreadsheets in which "[a]ll cell formulas must be included."  AR at 767–68. Offerors were told that the cost evaluation was to determine the probable cost of their approach, and that "[t]he Government will evaluate the offeror's cost proposal, supporting data, basis of estimate, and cost assumptions to determine cost realism, cost reasonableness and the offeror's understanding of the contract requirements." AR at 856.  The spreadsheets containing DRI's cost data exhibits and schedules, AR at 1302–73, reference the "Estimate Assumptions.xlsx" workbook in the formulas depicted for certain cells, but the link to that workbook could not be opened by the advisors preparing the cost report, AR at 2155.  Without access to this data, and absent an adequate explanation of DRI's cost estimating methodology in the Volume III text, the advisors could not determine the realism and reasonableness of the proposed costs and as a consequence could not derive any probable costs for plaintiff.  AR at 2155–62.

Plaintiff argues that its omission of the workbook data either was a clerical error that should have been the subject of a clarification request under 48 C.F.R. § 15.306(a)(2), or was a material defect making its proposal nonresponsive --- in which case the proposal should have been rejected before the evaluation stage of the procurement process.  Pl.'s Mot. at 10–11; Pl.'s Reply at 3–5.  Taking the latter (and more novel) argument first, DRI contends that the Contracting Officer informed its representatives during the oral debriefing "that the absence of the 'workbook' was noticed when the Plaintiff's Proposal was first reviewed."  Pl.'s Reply at 3.  The record contains no support for this contention.  Moreover, while the initial review of proposals conducted by the SEB Executive Secretary *could* have resulted in the decision to eliminate a proposal "before a detailed evaluation is performed," the SSP did not mandate such a result and allowed it only when a "proposal is determined to be so grossly and obviously deficient as to be totally unacceptable on its face or to contain prices that are inordinately high or unrealistically low."  AR at 54.

Nothing in the record suggests that the inoperative link to the workbook, embedded in cost spreadsheets, made the proposal "totally unacceptable on its face." Indeed, considering that the cost report in which the omission was first noted was issued on January 12, 2016, AR at 2148, more than three months after DRI's October 7, 2015 oral presentation, AR at 1374–450, it is likely that the Agency was not even aware that the data was missing before all of DRI's proposal costs were

incurred.[14]  In any event, plaintiff's unusual argument that it should have lost the competition earlier, sparing it some proposal costs and saving the government evaluation expenses, Pl.'s Mot. at 11, is not the sort of claim that can be raised in a post-award bid protest.  To have standing to challenge alleged errors in the award of a government contract, an offeror must allege that those errors --- either individually or cumulatively, *see USfalcon*, 92 Fed. Cl. at 450 --- deprived it of "a substantial chance of receiving an award."  *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1379–80 (Fed. Cir. 2009); *see also Info. Tech.*, 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  The claim that an error delayed the rightful denial of a contract award cannot fit under this concept of standing.[15]

Turning to DRI's more conventional argument concerning the omitted workbook data, it contends that the omission was a clerical error which the Agency should have sought to have clarified under 48 C.F.R. § 15.306(a)(2).  Pl.'s Mot. at 10–11.  Defendant and intervenor note that this FAR provision is permissive and does not require that an agency seek a clarification, even when a minor or clerical error is discovered.  Def.'s Mot. at 26; Int.'s Mot. at 28–29; Intervenor's Reply in Support Cross-mot. for J. on the R. (Int.'s Reply) at 6 n.4.  While this is true, there have been circumstances when this discretion has been found to have been abused by a procuring agency.  *See BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed.Cl. 502, 512 (2013).

Plaintiff's opponents, however, argue that the omission of the data and cost assumptions that were apparently contained in the workbook constitutes a material omission, not a clerical error eligible for clarification.  Def.'s Mot. at 27–28; Int.'s Mot. at 29.  Indeed, several precedents from our court have found that the erroneous omission of cost data from a proposal was not a minor or clerical error under the clarification provision.  *See Constellation W., Inc. v. United States*, 125 Fed. Cl. 505, 550 (2015) (citing *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 337 (2014); *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110–11 (2013)).  Just as in those cases, DRI omitted required information that was necessary for the evaluation of its proposed price.  Although that line of cases was identified by both defendant and intervenor, *see* Def.'s Mot. at 26–27 (discussing *Constellation W.* and

---

[14]  Under the procedure followed by the Agency, the SEB voting members did not see any of the cost information until the Capabilities and Approach factor evaluations were completed.  AR at 60, 2219.

[15]  In addition, the economic harm an agency imposes on itself due to an alleged procurement error cannot be the basis for an offeror's protest, *cf. Res Rei Dev., Inc. v. United States*, 126 Fed. Cl. 535, 549–50 (2016) (explaining that a protester cannot challenge actions harming only third parties), although it can obviously play a role in injunctive relief analysis.

*ST Net*); Int.'s Mot. at 29 (citing *Constellation W.*), DRI failed to address them, and cites no authorities in support of its contention that the omission of the workbook was a clerical error which imposed a duty to seek clarification on the Agency. Instead, plaintiff insists repeatedly that the omission was so "obvious" it must have been a clerical error, *see* Pl.'s Mot. at 10–12, and maintains that the inclusion of the workbook data "would not have materially altered the Plaintiff's cost proposal," Pl.'s Reply at 5. But it must have been obvious in these other cases that the offerors did not intend to leave certain cells in the spreadsheets contained in their proposals, and the missing information represented a small percentage of total costs, yet the omissions were found to be material. *See Constellation W.*, 125 Fed. Cl. at 549 (noting missing rates would have raised total price by 0.008%); *Bus. Integra*, 116 Fed. Cl. at 334–35 (explaining missing costs were 0.0041% of total). And in any event, while the missing data and assumptions may not have changed DRI's proposed price, they certainly could have had a "non-negligible effect" on the probable cost of plaintiff's proposal. *See Constellation W.*, 125 Fed. Cl. at 549. On this record, the Court cannot find that the Agency erred in treating this omission as material.

Even were DRI correct that its omission of the "Estimate Assumptions.xlsx" workbook was a clerical error that should have prompted a request for clarification from DOE, this protest ground would be of no avail to DRI. As both defendant and intervenor point out, *see* Int.'s Mot. at 30; Def.'s Reply at 4, after finding the DRI proposal unacceptable because realism analysis could not be performed to derive a probable cost, the SSO nevertheless explained why ORAU's proposal offered the Agency better value because of its technical superiority. AR at 2343–44. The SSO used DRI's proposed cost in her tradeoff analysis. *Id.* at 2344. Thus, the absence of the workbook data was not prejudicial to DRI, as a determination that its costs were realistic would not have altered the award decision.

### 3. The Agency's Failure to Provide Prospective Offerors With Certain Information Was Neither Improper Nor Timely Challenged

Plaintiff's next protest ground is that the Agency improperly failed to provide certain information that was requested during the pre-bid question and answer, adversely affecting its bid. Pl.'s Mot. at 12–15; Pl.'s Reply at 6–12. Two separate arguments are advanced by DRI on this ground: first, that information concerning the incumbent's labor mix and employee compensation and benefits should have been shared with prospective offerors, Pl.'s Mot. at 12–14; and second, that without access to this information, plaintiff relied on FTE levels contained in a report that the Agency referenced, which differed from ORAU's proposed numbers, *id.* at 14–15.

### a.  The labor mix and compensation data.

Two particular types of information are at issue here.  First, DRI claims that it was harmed by not being provided with information regarding the labor mix for the predecessor ORISE contract.  Pl.'s Mot. at 12–14.  A prospective offeror requested this information during the pre-bid question and answer period.  AR at 871.  Similarly, questions were asked concerning employee compensation and benefits under the incumbent's contract.  *Id.* at 872, 879–80.  The Agency responded to all of these inquiries by stating that all information that could be released already had been, and that most of the requested information represented contractor records that could not be released.  *Id.* at 871–73, 879–80.

Plaintiff argues that without information about the incumbent's labor mix, it could not have proposed staffing levels using the "bottoms up" methodology that the Agency preferred, and was thus unfairly criticized by the SEB for using a "top down" approach.  Pl.'s Mot. at 13–14 (citing AR at 2223, 2255–56, 2299–300); *see* AR at 758 (solicitation instruction requiring either "a detailed 'bottoms up' type estimating technique" or a "thoroughly explained" alternative methodology).  Concerning labor costs, DRI contends that its cost proposal would have been different had it known the level of benefits paid to the incumbent's staff, and been informed "that [XXXXXXX] of ORAU staff only works part time [XXXXXXX]."  Pl.'s Mot. at 13.

Defendant and intervenor argue that this protest ground has been waived, under *Blue & Gold Fleet*, due to DRI's failure to raise it before either the submission deadline or contract award.  Int.'s Mot. at 31 (citing *Blue & Gold Fleet*, 492 F.3d at 1313); Def.'s Mot. at 19 (citing *Blue & Gold Fleet*, 492 F.3d at 1315).  Plaintiff did not rebut this argument.  *See* Pl.'s Reply at 6–12.  At the hearing on these motions, DRI's counsel acknowledged that the Agency's refusal to provide the requested information was known prior to the deadline for submitting proposals, and conceded that he could not distinguish *Blue & Gold Fleet*.  *See* Tr. (July 29, 2016) (Tr.) at 17–18.  These concessions were wise, as this protest argument has clearly been waived under *Blue & Gold Fleet*.  Plaintiff contends that necessary information was not provided along with the solicitation materials, and the importance of its absence was established prior to the deadline for submitting proposals --- when requests for the information were denied at least one week before proposals were due.  *See* AR at 870 (questions and answers updated on Sept. 1, 2015).  Indeed, the Agency's answers to potential offerors' questions, updated as new questions were received, were issued as amendments to the solicitation, *see* AR at 227, 2204–05, and thus DRI is challenging the terms of the solicitation with this argument.  As no objection to the Agency's refusal to provide the information was made prior to the submission deadline, this ground has been waived.  *Blue & Gold Fleet*, 492 F.3d at 1313–15.

### b.  The Ten-Year Site Plan.

The second argument DRI makes under this ground focuses on the difference between staffing levels as reported in ORISE's Ten-Year Site Plan and those proposed by ORAU.  *See* Pl.'s Mot. at 14–15; Pl.'s Reply at 7–12.  Because this plan stated that 608 FTEs supported the ORISE contract in fiscal year 2014 and projected that same level of staffing for fiscal year 2016, Pl.'s Ex. A at 3–4, DRI proposed 608 FTEs to perform the contract --- divided between 511 "direct" FTEs and 97 "indirect" FTEs.  AR at 1115–16.  As intervenor was awarded the contract by proposing only 205 FTEs, *see* AR at 1926, 2311, plaintiff maintains that it was either misled by the numbers in the Ten-Year Site Plan or held to a different standard from that applied to ORAU.  Pl.'s Mot. at 14–15.  There are at least three problems with this argument of DRI.

First, the Ten-Year Site Plan was not incorporated into the solicitation, but was instead referenced in response to two questions that were unrelated to staffing levels under the contract.  Potential offerors were told they "should review" the plan because it "addresses both the anticipated actions and estimated timeline by which activities should be completed" concerning the disposal of two government-furnished buildings.  AR at 872.  They were also informed that they "may reference the facility maintenance cost projections" in the plan.  AR at 878.  Potential offerors were not instructed to use the Ten-Year Site Plan for any other purposes, and thus the Agency did not mislead DRI into following the staffing projections in that document.

Second, as both defendant and intervenor emphasize, *see* Def.'s Mot. at 24; Int.'s Mot. at 33, DRI's proposed staffing was not criticized for its total number of FTEs proposed, but rather for not adequately explaining the methodology it used to arrive at its labor mix and staffing approach.  *See* AR at 2160, 2255–56, 2299–301.  Even if plaintiff was led to believe, based on the Ten-Year Site Plan projections, that the Agency desired 608 FTEs to support the contract, it was not its use of this figure but rather its inability to adequately justify how those employees would be distributed that negatively affected its evaluation.

Finally, as the government best explains, *see* Def.'s Mot. at 24–25, the direct labor FTEs proposed by ORAU were not the full measure of its staffing.  Included in intervenor's "Other Direct Costs" (ODCs) were the costs of subcontractors and such functions as professional services, site services, equipment maintenance, and computer support.  AR at 2170, 2315–16.  These costs were [XXXXXXXXXXXXX] than ORAU's proposed direct labor costs.  *See* AR at 1926.  The cost evaluators confirmed that the proposed ODCs were consistent with the incumbent's performance history.  AR at 2170.  According to defendant's calculations, the indirect labor hours implicit in the ODCs category would raise ORAU's total FTEs proposed to be roughly [XX] percent of the DRI figure.  Def.'s Mot. at 25 (citing AR

at 1960, 1989, 1991, 1993).  For our purposes, what is important is that the record shows that the calculations of FTEs supporting the ORISE contract historically included personnel whose costs were charged as ODCs, and that intervenor's proposal was consistent with that practice.  Thus, plaintiff has failed to show that the ORAU proposal was evaluated under a different standard regarding staffing levels, as staffing costs proposed as ODCs cannot be ignored in assessing the labor effort proposed by intervenor.

### 4.  Plaintiff's Criticisms of the SEB's Technical Evaluations are Mere Disagreements with the Agency's Judgment

The next protest ground raised by DRI consists of criticisms of six specific aspects of the SEB's evaluation of the proposals under the Capabilities and Approach factor.  *See* Pl.'s Mot. at 16–22.[16]  According to plaintiff, these portions of the evaluations either lacked record support, were inconsistent, or were contrary to the stated criteria.  *Id.* at 15.  But as we shall see, no objective errors or subjective inconsistencies have been identified, *see USfalcon*, 92 Fed. Cl. at 461, and thus DRI's criticisms merely reflect disagreement with the Agency's technical judgments --- judgments which a court may not second guess, *see E.W. Bliss Co.,* 77 F.3d at 449.

First, DRI takes issue with the weakness it received due to the absence of "commitment letters" from its proposal, *see* AR at 2277, which were supposed to be provided by entities supplying goods or services, at no charge to the government, for use in connection with the ORISE contract.  Pl.'s Mot. at 16–17; AR at 789, 856.  It is not disputed that DRI failed to provide such letters, as plaintiff instead contends that the Agency treated the two offerors disparately.  Pl.'s Mot. at 16–17.  This argument rests on the fact that ORAU did not provide commitment letters from its proposed subcontractors.  *Id.* at 17.  But plaintiff is confusing two different solicitation provisions.  The solicitation had no requirement that proposed subcontractors, who will be providing goods or services in exchange for compensation, furnish "commitment letters."  See AR at 785–86.  Such letters were only required for entities that were pledging to provide free goods or services to support the ORISE contract.  *See* AR at 789, 856.  Thus, no disparity in treatment has been shown.

---

[16]  In addition to the particular critiques, DRI also argues generally that the evaluation criteria were vague and that the definitions for the adjectival ratings were not disclosed.  Pl.'s Mot. at 15–16.  But complaints about what the solicitation contained or should have contained are waived at this juncture.  *See Blue & Gold Fleet*, 492 F.3d at 1313–15.  And plaintiff's counsel conceded that he is aware of no regulation or statute requiring the prior disclosure of adjectival ratings definitions.  Tr. at 27.  *See also* 48 C.F.R. § 15.304(d) ("The rating method need not be disclosed in the solicitation.").

Second, plaintiff challenges the weaknesses it received, under the Strategic Vision and Program Implementation criteria, in connection with its proposed move of the REAC/TS operations to a new facility. Pl.'s Mot. at 18–19. The SEB found that "the proposal does not contain sufficient information regarding the required resources, resource related assumptions, and other assumptions related to the proposed move," and "failed to demonstrate the capability to leverage limited resources in developing the Institute's capabilities." AR at 2229 (citing AR at 936–37, 987). The evaluators were also concerned that a diversion of resources to accomplish the proposed move "would have a negative impact on mission execution because fewer resources would be available for training." AR at 2255. These weaknesses were based on the application of evaluation subcriteria, *see* AR at 852–53 (Strategic Vision subcriterion 2 and Program Implementation subcriterion 3), and the portions of DRI's Volume II that were referenced did not discuss the resources required, as the SEB states, *see* AR at 936–37, 987. Plaintiff's objection is that at an unspecified place in the introduction to its proposal, it committed to keep expenses within budget. Pl.'s Mot. at 18–19. But this does not contradict the SEB's concerns about a lack of detail regarding the proposed move. The Court finds that the SEB adequately explained the reasoning behind these weaknesses.

Plaintiff's third argument relates to weaknesses DRI was assigned under the Leadership, Management, and Direction criterion. Pl.'s Mot. at 19–20 (citing AR at 2243–46). Rather than identifying any objective errors or subjective inconsistencies on the part of the SEB, plaintiff instead cites the strengths noted in one individual evaluator's preliminary review of its proposal, which were not reflected in the SEB's final report. *Id.* at 19 (citing AR at 2875–76, 2878). But since a consensus approach was followed by the SEB, *see* AR at 2216, such preliminary findings of individual evaluators are rarely a basis for undermining the rationality of the ultimate evaluation, *see Tech Sys.*, 98 Fed. Cl. at 246–48, and DRI has failed to make that case here.[17]

The fourth disputed area of the Capabilities and Approach factor evaluation concerns a weakness DRI received under the Leadership, Management, and Direction criterion. Plaintiff maintains it was "highly criticized" because, during its oral presentation, its entire management team was shown to be unfamiliar with DOE's Office of Science peer review process. Pl.'s Mot. at 20–21 (citing AR at 2245). The SEB found this to be problematic because understanding the Office of Science's peer review process was necessary to successfully accomplish the Science and Technical Resource Integration required by the PWS. AR at 236–37, 2245. Plaintiff claims it had "no way" to obtain information about the current peer review process,

---

[17]  Erring in the other direction, DRI also inaccurately attributes to the SEB a significant weakness that the same individual evaluator assigned it in his preliminary review. *See* AR at 2876 (noting DRI's proposed REAC/TS Director was not a medical doctor); Pl.'s Mot. at 19 (identifying same).

Pl.'s Mot. at 20, but defendant notes that this information is publicly available, Def.'s Mot. at 32 n.1 (citing http://science.energy.gov/sc-2/committees-of-visitors); *see also* Int.'s Mot. at 39 n.25. The Court notes that this criticism was merely one of seven bullet points listed to support the finding of a weakness regarding the qualifications of DRI's proposed key persons, and did not have the significance that plaintiff suggests. *See* AR at 2244–45. Plaintiff seems to be arguing that it was immune from criticism in this area, as it claims that it mentioned "peer review" fourteen times in its proposal. Pl.'s Mot. at 20 (citing AR at 929, 933–36). But particularly considering that the Statement of Work for STRI required the contractor to "[i]dentify improvements to DOE peer review practices," AR at 237, there is no basis for concluding that the SEB acted improperly in finding that a lack of knowledge of those practices contributed to a weakness for DRI's proposed management team.

Plaintiff's fifth claim regarding the SEB's evaluation centers on the strength ORAU received for its approach to handling workload fluctuations. The SEB found that it was "an efficient business practice" that the majority of ORAU's proposed staff would divide its work between the ORISE contract and other endeavors. AR at 2258. Plaintiff questions whether this approach should be viewed positively or negatively, and posits several potential problems with such an arrangement. Pl.'s Mot. at 21–22. But DRI identifies no solicitation provision that is violated by the approach and no inconsistency in the SEB's evaluation. Plaintiff merely disagrees with the Agency's judgment, which is no basis for questioning a procurement decision. *See E.W. Bliss Co.,* 77 F.3d at 449.

The final challenge to the SEB's evaluation concerns an alleged inequality created by ORAU's ownership of certain property, called the North Campus, which it could continue to use to perform the contract. Pl.'s Mot. at 22; Pl.'s Reply at 12–17. The government-furnished facilities, available for use by the successful offeror, were located at the South Campus and in a local medical center. AR at 584. Plaintiff argues that any offeror which was not the incumbent would have to bear the costs of moving the ORISE operations from the North Campus to other buildings, including leasing and renovation costs, and that the Agency should have leveled the playing field by removing facilities costs from the procurement. Pl.'s Mot. at 22: Pl.'s Reply at 16–17. Curiously, its only support for this proposition are two Government Accountability Office (GAO) decisions that explain that advantages, including cost advantages, that an incumbent enjoys by virtue of prior performance (including the ownership of key property) need not be equalized unless that advantage is the result of unfair government action. Pl.'s Reply at 16 (citing *GTE Automatic Elec., Inc.,* B-209393, 83-2 CPD ¶ 340, 1983 WL 27378, at *1–3 (Comp. Gen. Sept. 19, 1983); *Romar Consultants, Inc.,* B-206489, 82-2 CPD ¶ 339, 1982 WL 27429, at *2–3 (Comp. Gen. Oct. 15, 1982)). But DRI has not identified anything, in the record or elsewhere, that shows the North Campus was obtained through some improper action of the Agency, and the GAO decisions recognize that

the advantage enjoyed by an incumbent by virtue of having amortized the costs of property that it will continue to use for performance is not an improper advantage that must be equalized. *GTE Automatic Elec.*, at *3 (citing *B.B. Saxon Co.*, 57 Comp. Gen. 501, 513 (June 1, 1978)). Most fatal to this argument, however, is the fact that ORAU's ownership of the North Campus was made known to potential offerors in the questions and answers that were issued as amendments to the solicitation. *See* AR at 870–71. Any protest ground based on the solicitation's failure to equalize the advantages of that ownership is waived, since it was not raised prior to the deadline for submitting proposals. *Blue & Gold Fleet*, 492 F.3d at 1313–15.

### 5. *The Source Selection Decision Was Not Arbitrary*

In DRI's final argument, it takes issue with one sentence in the SSO's Source Selection Decision, which paraphrases SEB findings, and one paragraph from that decision containing an independent observation of the SSO.[18] Pl.'s Mot. at 23. Both of these are in the SSO's evaluation of the proposals under the Strategic Vision criterion. AR at 2336.

First, plaintiff challenges the following sentence concerning the SEB's evaluation of its proposal under the first criterion: "The SEB concluded that the proposal from DRI failed to demonstrate the capability to leverage limited resources in developing ORISE's capabilities, and specifically does not enable ORISE to achieve DOE goals, and would not deliver outcomes consistent with mission goals relative to the PWS area." Pl.'s Mot. at 23 (citing AR at 2336). Plaintiff maintains that the SEB did not reach a "general conclusion" concerning its ability to leverage limited resources, but made such a finding "on a couple of separate issues" without factual support. *Id.* But the SEB fully explained its reasons for these findings --- one relating to the proposed move of the REAC/TS facility, and the other concerning DRI's "overall" Strategic Vision and plan for its implementation. AR at 2220–21, 2229–30. The SSO accurately recounted these conclusions, the second of which was a general conclusion about the proposal under this criterion.

Regarding the back end of this sentence, DRI contends that no facts were identified to support the findings concerning DOE goals, and that the term "goals" was not defined nor even included in the PWS. Pl.'s Mot. at 23. But the SEB report, with which the SSO agreed, AR at 2336, explains in detail the evaluators' concerns that DRI would not allow the Agency to achieve its goals for three of the

---

[18] Plaintiff also makes general comments at the beginning and end of this argument that the SSO had prejudged the competition in favor of ORAU. Pl.'s Mot. at 23–24. Plaintiff points to no facts to support this claim, other than the particular challenges to evaluation decisions discussed above, so the Court will not address it further.

five activities described in the PWS, AR at 2221, 2230–31 (discussing STRI, REAC/TS, and IEAV); *see* AR at 236–39 (Statement of Work).  Moreover, the first two subcriteria under Strategic Vision concern "goals as articulated in the Performance Work Statement."  AR at 852.  If DRI believes that a definition of these goals was missing from the solicitation, the time to challenge this was before its proposal was due, and accordingly this ground is waived.  *Blue & Gold Fleet*, 492 F.3d at 1313–15.

Plaintiff also contends that the SSO improperly criticized its proposal for focusing on primary and secondary education, in addition to ORISE's traditional focus on education at the college level and above.  Pl.'s Mot. at 23.  Although DRI argues that this criticism was inconsistent with the solicitation's injunction to "ensure a robust supply of STEM professionals to meet science and technology needs . . . for students and faculty at all educational levels," *id.* (citing AR at 236), the SSO's concern was the proposal's "*focus* on a K-12 outreach," AR at 2336 (emphasis added), not the fact that pre-college students would be included in programs.  In any event, as intervenor notes, Int.'s Mot. at 48, the SSO did not assign an additional weakness to DRI because of this issue, and her observation did not alter plaintiff's rating under the criterion, *see* AR at 2336–37.  As plaintiff has identified no objective errors or subjective inconsistencies relating to this particular observation, but merely disagrees with the SSO's judgment, this bid protest ground fails.  *See E.W. Bliss Co.,* 77 F.3d at 449.  In sum, plaintiff has failed to demonstrate that the SSO's decision was arbitrary or otherwise improper.

## III.  CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record is **DENIED**, and defendant's and intervenor's cross-motions for judgment on the administrative record are **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge